IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.:

AST & SCIENCE LLC,

        Plaintiff,

vs.

DELCLAUX PARTNERS SA,

        Defendant.

_____/

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff AST & Science LLC ("AST") brings this action against Defendant Delclaux Partners SA ("Delclaux") alleging as follows:

## INTRODUCTION

1. In breach of contract and in violation of United States Securities Laws, Defendant Delclaux acted in the capacity of a broker-dealer without the requisite registrations and licensures.

2. AST had contracted with Delclaux to serve as a "finder" in connection with its Series A and Series B financings. As a finder, Delclaux would be limited to introducing potential investors to AST and could take no further part in the investment process.

3. AST received express assurances from Delclaux that, for whatever activity it did ultimately take under the contract, it would have and would maintain all licenses, permits, and other authorizations required under applicable laws, rules, and regulations.

4. AST paid significant sums to Delclaux as a "finder's fee" upon the closing of the Series A financing, all without knowing that Delclaux had acted beyond the scope of a mere finder and

1

without the requisite licenses and registrations of a broker-dealer under the Securities Exchange Act of 1934 (the "Exchange Act") and the rules of the Financial Industry Regulatory Authority ("FINRA").

5. Instead of disclosing its breach and unauthorized conduct, and returning the monies paid, Delclaux demanded additional payments from AST in connection with the Company's Series B financing. Such demands were unwarranted and audacious—not only because Delclaux was in breach of the Parties' contract, but because Delclaux had provided no services of value to AST in connection with the Series B.

6. AST rejected Delclaux's demands for payment. Because it did not yet realize that Delclaux had failed to comply with the terms of the Parties' contract, it sought to work with Delclaux to find an amicable resolution to the demands and establish a positive working relationship going forward.

7. Dissatisfied, Delclaux, by and through its CEO and President, Pedro Delclaux, initiated a campaign of harassment. Delclaux continued to press its unfounded claim for additional fees with AST—repeatedly contacting AST's officers, instigating conflict with AST's former investment banker, and contacting certain of AST's investors.

8. During this time, AST discovered Delclaux's breach. By formal correspondence sent in January 2020, AST promptly notified Delclaux of the breach and terminated the Parties' contract.

9. Delclaux, however, was undeterred. Harassing messages continued, pressing arguments that had long since been rejected by AST. Gaining no traction with AST's officers, Delclaux determined to make its demands directly to AST's Board of Directors, disparaging AST's CEO and COO/CFO in the process.

10. Given that hostilities appeared to be unavoidable, AST resolved to initiate this lawsuit to seek redress for Delclaux's contractual breaches and to recover the damages suffered by AST in connection with the same.

## JURISDICTION AND VENUE

11. Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a) because this is a civil action between Plaintiff, a citizen of a State, and Defendant, a citizen of a foreign state, and the value of the matter in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs.

12. Subject matter jurisdiction is also proper under 28 U.S.C. § 1331 because this action arises under the laws of the United States insofar as it necessitates the resolution of disputed and substantial federal issues under United States Securities Laws.

13. Personal jurisdiction is proper because Defendant Delclaux has sufficient minimum contacts with Florida, including by negotiating a contract that is governed by Florida law and that provides for Florida courts as the exclusive forum for any disputes arising under the contract, and by soliciting and doing business with an entity whose principal place of business was in Florida for the majority of the time period relevant to this lawsuit.

14. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the negotiations of the contract which gives rise to this lawsuit occurred in the Southern District of Florida. In addition, that contract provides for "the applicable state or federal court in Miami, Florida" as the exclusive forum for any disputes between the Parties.

## PARTIES

15. AST is a Delaware limited liability company in the business of satellite technology and global satellite-based communications. Its principal place of business is currently at the Midland

International Air and Space Port at 2901 Enterprise Lane, Midland, TX 79706.  Until 2019, its principal place of business was at 111 Brickell Avenue, Suite 1100, Miami, Florida 33131.  AST continues to maintain an office in the Miami area.

16. Delclaux is a Spanish company located at Paseo de la Castellana 151, 11-A, Madrid 28046, Spain.

## FACTUAL BACKGROUND

### *Delclaux Begins Working With AST*

17. AST was formed in 2017 by satellite-industry pioneer, entrepreneur, and inventor Abel Avellan.  Together with its global partners, the Company is currently building the first and only space-based cellular broadband network aimed to provide high speed connectivity to smartphones located anywhere on Earth.

18. In late 2017, AST began working with Delclaux as it initiated its Series A financing.

19. Delclaux introduced AST to an investment banking company located in New York to assist with the Company's financing efforts.

20. AST and the investment banking company contracted in November 2017, and the Series A financing was pursued in earnest.

### *The Parties Enter a Finder's Fee Agreement*

21. As work on the Series A proceeded and work on a Series B financing was getting underway, AST and Delclaux discussed entering a formal contract.

22. Following discussions between the Parties, a Finder's Fee Agreement was entered as of June 18, 2018 (the "Agreement").  A copy of the Agreement is attached hereto as **Exhibit A**.

23. Under the Agreement, Delclaux was to serve in the role a "Finder" for all "Financings."  It was to assist AST and AST's investment banker with efforts relating to the Financings, but was

not to "perform any act in connection with [the] Agreement, which (i) would require Finder to be registered as an investment advisor or broker-dealer or (ii) is in violation of any state or federal securities laws in the United States of America or any other relevant securities laws in other jurisdictions."

24. The Agreement did not detail the types of activity in which Delclaux could engage. Instead, assured by Pedro Delclaux's representations of having more than 40 years' experience in similar types of arrangements, AST relied on Delclaux to know and stay within any applicable legal and regulatory boundaries.

25. In that regard, Delclaux expressly covenanted, represented, and warranted to AST that, whatever work was performed under the Agreement, it would have and would maintain "all licenses, permits and other authorizations required by applicable laws, rules or regulations…" Delclaux further covenanted, represented, and warranted that it would "conduct its activities in connection with its engagement hereunder in compliance with all applicable securities and other laws, rules and regulations." In addition, Delclaux promised to indemnify AST for any losses, claims, damages, costs, and expenses incurred as a result of a breach of these covenants.

26. Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), forbids unregistered brokers or natural persons not associated with a registered broker from "making the use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." The referenced subsection includes the requirement that registration as a broker also requires an entity to become a member of FINRA, as the only "national securities association" chartered under the Exchange Act. In the case of individuals, this requirement is met by becoming registered, sometimes also referred to as

"licensed," as an associated person of a FINRA member organization. In turn, FINRA Rule 2040 prohibits the payment of transaction-based compensation to unregistered brokers.

27. In terms of Delclaux's compensation under the Agreement, it provided for fees in two different circumstances. First, Delclaux would receive fees in connection with any investments made by specified potential investors in connection with the Series B financing. Second, Delclaux would receive a portion of any fees paid to the investment banker that it had introduced to AST in connection with either the Series A or B financings.

28. Both forms of potential payment to Delclaux were contingent upon the closing of investments made in the Series A and B financings, and were to be calculated as a percentage of any amounts so invested.

### *AST Successfully Closes Its Series A Financing and Pays Delclaux*

29. AST successfully closed its Series A financing at the end of June 2018.

30. AST raised $10 million in the Series A.

31. Delclaux was paid a fee at the close of that transaction, which fee was invoiced as a "finder's fee," but was calculated as a percentage of the actual cash payment made to the investment baking company introduce by Delclaux.

### *Delclaux Demands Additional Payments and AST Discovers Delclaux's Breach*

32. Efforts on the Series B financing followed the close of the Series A.

33. In January 2019, AST replaced its investment banking company with a new company that had no connection with Delclaux.

34. AST raised approximately $110 million in connection with the Series B, closing transactions with multiple investors at the end of 2019 and in 2020.

35. After the first of these transactions closed in October 2019, Delclaux began inquiring about additional fees. AST explained to Delclaux that no fees were owing under the Agreement. The particular investors with whom Delclaux had introduced AST and who were specified in the Agreement had not invested. In addition, no payments were otherwise due to the original investment banking company to whom Delclaux's additional fee was tied.

36. The investments that made up the Series B all resulted from AST's own efforts and those of its new investment bankers. Neither the work of AST's original investment banking company, nor any work of Delclaux contributed to the investments.

37. Nevertheless, through the end of December 2019, Delclaux made repeated demands for additional fees. AST sought to work with Delclaux to find an amicable solution and establish a positive working relationship going forward.

38. No resolution was reached, however, and Delclaux continued to press its demands.

39. AST then learned that Delclaux's activities under the Agreement were beyond the scope of a mere finder. During the term of the Agreement, Delclaux had directly engaged with potential investors over and above simple introductions. Delclaux sought business plans of AST, marketing presentations, and AST's financials, and, on information and belief, obtained and used such confidential materials. Delclaux directly pursued discussions with potential investors on behalf of AST, following up with their representatives after initial contact had been made. Delclaux attended meetings and took telephone calls with potential investors, and was otherwise involved in activities surrounding the fundraising process.

40. Moreover, Delclaux negotiated an agreement with AST's initial investment banker whereby the investment banker's fee from AST was reduced in an amount that would account for and be equal to the fee to be paid to Delclaux. Both fees for Delclaux under the Agreement were

ultimately transaction-based, meaning they were only paid upon a successful investment in connection with the Series A and B financings, and were determined based on a specified percentage of the amount invested.

41. In short, Delclaux engaged in activity on behalf of AST and received payments from AST that transformed the intended role of a finder into one of a broker-dealer.

42. AST's reliance on Delclaux to know and abide by the rules and guidelines applicable to finders and broker-dealers was quickly shown to have been misplaced. Upon further investigation, AST learned that Delclaux's activities and payment under the Agreement constituted the work of a broker-dealer that required certain licenses and registrations. Despite the representations and covenants in the Agreement that all necessary licenses and registrations would be in place and maintained, AST discovered that Delclaux was not registered with the United States Securities & Exchange Commission ("SEC") and was not licensed with or a member of FINRA.

43. Accordingly, by letter dated January 26, 2020, AST formally terminated the Agreement with Delclaux, notified Delclaux of its breach, demanded a return of all confidential information as required under the Agreement, and once again rejected Delclaux's persistent demands for additional payment.

*Delclaux Engages in a Campaign of Harassment*

44. Delclaux, however, did not acknowledge its breach, return AST's confidential information, or offer to return the monies it improperly received from AST in connection with the Series A financing.

45. Instead, Delclaux initiated a campaign of harassment, repeatedly contacting AST's officers with the same demands for payment that had already been rejected.

46. On information and belief, Delclaux also sought to incite controversy between AST and its former investment banking company, hoping that if the investment banking company would somehow demand and receive a fee, Delclaux might receive the derivative fee it was seeking.

47. Making no progress with AST's officers, Delclaux began contacting investors and board members of AST, disparaging AST's officers and claiming that payments were being unfairly withheld.

48. With no end to the hostilities in sight, and having suffered damages, including in the form of payments made to Delclaux while it was in breach of the Agreement, AST determined to initiate this lawsuit.

## COUNT ONE
### (Breach of Contract)

49. AST realleges and incorporates by reference paragraphs 1 through 48 of this Complaint.

50. The Agreement between AST and Delclaux created legally enforceable rights and obligations.

51. At all relevant times, AST adequately performed and fulfilled its obligations under the Agreement.

52. Delclaux breached the Agreement, including by (i) engaging in activity that exceeded the agreed upon scope of its activities under the Agreement, (ii) not obtaining or maintaining all licenses, permits, and other authorizations required by applicable laws, rules, or regulations governing Delclaux's activities under the Agreement, (iii) not acting in compliance with all securities and other laws, rules, and regulations applicable to Delclaux's activities under the Agreement, and (iv) refusing to return confidential information obtained from AST under the Agreement.

53. AST has sustained and will sustain damages as a result of Delclaux's breaches of the Agreement, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, AST respectfully requests that this Honorable Court award the following relief:

a. Assume jurisdiction of this case;

b. Enter judgment in AST's favor and against Delclaux on Count I of this Complaint;

c. Award monetary damages incurred by AST as a result of Delclaux's breaches, in an amount to be proven at trial, and disgorgement of all fees paid by AST to Delclaux under the Agreement, together with all expenses, costs, and applicable interest; and

d. Award such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

AST hereby demands a trial by jury for all claims so triable.

Dated: August 11, 2020

                                                        Respectfully Submitted,

                                                        */s/ Mark J. Neuberger*
                                                        Mark J. Neuberger (Fl. Bar No. 982024)
                                                        Andrea Picco (Fl. Bar No. 1011573)
                                                        FOLEY & LARDNER LLP
                                                        One Biscayne Tower
                                                        2 South Biscayne Boulevard
                                                        Miami, Florida 33131
                                                        Telephone: 305-482-8400
                                                        Facsimile: 305-482-8600
                                                        mneuberger@foley.com
                                                        apicco@foley.com

                                                        and

4817-8492-5383.1

        Geoffrey M. Raux (motion for admission *pro hac vice* forthcoming)
graux@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: 617-342-4000
Facsimile: 617-342-4001

Joseph D. Edmondson, Jr. (motion for admission *pro hac vice* forthcoming)
jedmondson@foley.com
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W.
Washington, D.C. 20007
Telephone: 202-672-5300
Facsimile: 202-672-5399

*Attorneys for Plaintiff*

4817-8492-5383.1